**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

DACOSTA DANIELS,

    Plaintiff,

vs.

JOSHUA TYLER, Individually,

    Defendant.

No. C 13-4068-MWB

**MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

_____

**TABLE OF CONTENTS**

*I.*    *INTRODUCTION*..................................................................*2*
    *A.*    *Factual Background* ............................................................ *2*
    *B.*    *Procedural Background* ...................................................... *6*
*II.*    *LEGAL ANALYSIS* ............................................................... *8*
    *A.*    *Standards For Summary Judgment* ...................................... *8*
    *B.*    *Standards For Qualified Immunity From "Excessive Force" Claims*................................................................................. *9*
    *C.*    *Application Of The Standards*............................................ *13*
*III.*    *CONCLUSION* .................................................................. *15*

In this case, plaintiff DaCosta Daniels asserts a state-law "assault" claim and a federal constitutional claim of use of "excessive force," pursuant to 42 U.S.C. § 1983, against defendant Sioux City Police Officer Joshua Tyler, in his individual capacity, arising from Daniels's arrest in 2011. This case is now before me on defendant Tyler's Motion For Summary Judgment (docket no. 35) on the basis of qualified immunity.

## I.  INTRODUCTION
### A.  Factual Background

I find that a rather more circumscribed statement of facts—disputed and undisputed—than the parties have offered is sufficient to put in context the parties' arguments concerning defendant Tyler's Motion For Summary Judgment. Unless otherwise indicated, the facts stated here are undisputed.

Defendant Tyler is a plain-clothes police officer assigned to the Street Level Drug Unit of the Sioux City Police. On or before August 8, 2011, he received information that Christopher Robinson, a person known to him, was selling drugs and involved in the trafficking of firearms. Tyler also knew that Robinson was barred from driving, which would provide a legitimate reason to stop and investigate him, if the opportunity arose. Tyler had also received a tip that plaintiff DaCosta Daniels, accompanied by a person matching Robinson's description, was renting cars on Friday and bringing them back on Monday. At around 2:10 p.m. on August 8, 2011, Tyler saw a small silver passenger car matching the description of Daniels's latest rental car being driven by Robinson. Daniels disputes that Robinson was driving the car. Tyler saw Robinson yelling at a man walking on the other side of the street, and that man got into the backseat of the car.

2

Tyler radioed for a marked unit to stop the car, because Robinson was barred from driving. Officer Bill Nice responded.

When Officer Nice first saw the car, it was traveling in the opposite direction from him, and was being driven by a man matching Robinson's description, with a female passenger. Again, Daniels denies that Robinson was driving the car. Officer Nice turned his car around at the first available intersection, but by the time he caught up with the car, it was parked in front of a house, Robinson had disappeared, and Daniels was sitting in the driver's seat, and the male passenger was still in the backseat. Officer Nice approached the vehicle, asked Daniels to identify herself, to tell him where Robinson was, and to exit the car. The parties dispute whether Daniels was uncooperative and responded with profanity, but they agree that she eventually exited the car. Tyler alleges that Daniels only did so when Officer Nice told her that he would arrest her if she did not comply. The parties dispute whether Daniels continued to be verbally abusive during the remainder of the incident and whether Officer Nice had any safety concerns. They agree, however, that Officer Nice asked Daniels to stand in front of his patrol car. Consequently, the remainder of the incident was captured on the dashboard videocamera of Officer Nice's patrol car.

While standing in front of Officer Nice's patrol car, Daniels had a large soda in one hand and her cellphone in the other. While Officer Nice was talking with Daniels, Tyler, who was not yet at the scene, saw a person matching Robinson's description running through a nearby alleyway, so Tyler requested that additional police units check the area for Robinson. When Tyler arrived at the scene, he approached Officer Nice and Daniels, with a police radio in his hand, and Officer Nice acknowledged him. Tyler alleges that he smelled marijuana in the rental car. Daniels contends that Officer Nice did not identify Tyler as a police officer and that she did not see the police radio in Tyler's hand. The parties also dispute whether bystanders had begun to gather in the area.

Tyler began to talk to Daniels, and Officer Nice went to talk to the male passenger. The parties, again, dispute whether Daniels continued to "spew profanity," yell, or behave belligerently during their entire conversation. Officer Nice rejoined Tyler and Daniels. Daniels admits that when she asked why she was being questioned, Tyler told her that it was because she allowed Robinson to drive her car when she knew that he was barred. Officer Nice again left Tyler and Daniels alone.

Daniels admits that she began to dial or text on her cellphone with one hand, while holding a large soda in the other hand. Tyler alleges that he told Daniels to put down her cellphone, out of concern that she was contacting Robinson or someone else who could jeopardize officer safety, and that lots of people were milling around the neighborhood by this time. Daniels states that she admits this statement in part and denies it in part, but specifically denies only Tyler's assertion that there were lots of people milling around the neighborhood. Daniels also specifically admits that she did not respond to requests to put down her cellphone and that, when Tyler asked her a third time to get off her cellphone or he would take it from her, she still did not respond.

The parties agree that Tyler reached for the cellphone and that Daniels pulled it away. They also agree that, at this point, Tyler intended to arrest Daniels for failure to obey the direction to put down the cellphone and for failure to put her hands behind her back when asked, as well as for allowing a barred driver to operate her vehicle. A struggle ensued between Tyler and Daniels. Officer Nice rejoined them and joined in Tyler's efforts to subdue Daniels.[1] Daniels contends that she did not understand what

---

[1] Although the parties do not state this fact, the dashboard video, which I have reviewed several times, shows beyond dispute that Officer Nice eventually got the cellphone away from Daniels or Tyler, and placed it out of reach on the hood of his patrol car. The video also shows beyond dispute that, more than once during the struggle, Tyler

4

was happening. Officer Nice attempted to handcuff Daniels, but Daniels dropped her soda and struck Tyler in the left shoulder with her right hand. The officers continued their attempts to handcuff Daniels, Officer Nice threatened to tase Daniels, and the officers eventually cuffed one of Daniels's hands and pushed her down over the hood of the car.

At some point in the scuffle, Daniels grabbed Tyler's shirt and/or belt with her uncuffed hand, near where his service weapon was located. Officer Nice again threatened to tase Daniels if she did not let go of Tyler's shirt and stop resisting. At this point, the video shows that Tyler was grasping Daniels's wrist above the hand holding his shirt, and Officer Nice was grasping Daniels's other wrist, with the handcuff on it. Daniels admits that Tyler commanded her two or three times to let go of him, or he would strike her, that she did not let go, and that Tyler then struck her several times in the back. Tyler contends that the strikes were a compliance measure intended to distract rather than to cause injury, but Daniels denies that the force used was appropriate. The parties agree that Daniels did not let go of Tyler's shirt or belt even after Tyler struck her. They dispute, however, whether there was any legitimate concern that Daniels could use the handcuffs as a weapon, because only one of her hands was cuffed, as Tyler contends.

The parties agree that, in the midst of their struggles, Robinson reappeared, which the officers allege caused them further concerns about safety and Robinson's motives, but that he again left the scene. The officers eventually succeeded in cuffing both of Daniels's hands and getting her seated on the bumper of Officer Nice's patrol car. The

---

got his arm around Daniels's head and neck, but Daniels nowhere alleges that Tyler used any sort of "choke hold" on her. Daniels never suggested that she was rendered unconscious by Tyler's holds on her, although she did contend that she lost consciousness for a few seconds after been forced onto the hood of the patrol car, a contention that she appears to have abandoned on summary judgment.

5

officers could not place Daniels in Officer Nice's patrol car, because it was a canine unit with no available backseat, so Daniels was placed in another police vehicle when it arrived on the scene.

Although Daniels requested medical attention and complained that her insulin pump had been torn lose, paramedics called to the scene did not see any obvious injuries to Daniels's eye or back or any injuries from her insulin pump coming lose, so that they did not see any reason to transport her to the hospital. Daniels was, instead, transported to the Woodbury County Jail. The parties dispute the nature, extent, and cause of any injuries, including emotional distress, that Daniels claims that she suffered during and as a result of the incident on August 8, 2011.

Daniels was charged with permitting an unauthorized driver to operate the rental car, failure to obey police officers, interference with official acts, and assault on a peace officer. She was convicted in a bench trial of failure to obey and interference with official acts and in a jury trial of assault on a peace officer, for which she was sentenced to 12 days in jail.[2]

### B. Procedural Background

In her Complaint (docket no. 2), filed July 29, 2013, Daniels asserted, in Count I, that Tyler's actions constituted an "assault"; in Count II, a claim pursuant to 42 U.S.C. § 1983, that Tyler's actions constituted use of unconstitutional "excessive force" against her before and in the course of her arrest; and, in Count III, another claim pursuant to 42 U.S.C. § 1983, that the City of Sioux City is subject to "*Monell* liability" for Tyler's

---

[2] The parties do not argue the significance of Daniels's conviction for assaulting Tyler to her own claims of assault and excessive force against Tyler.

6

actions based on a custom and policy of deliberate indifference to the rights of citizens. On August 20, 2013, the City and Tyler filed a joint Answer (docket no. 12), denying the claims against them and asserting various affirmative defenses.³

On April 3, 2014, the parties filed a Stipulation For Dismissal With Prejudice (docket no. 29), dismissing, *inter alia*, Count III against the City. From that point, the only parties to this action were plaintiff Daniels and defendant Tyler, in his individual capacity, and the only claims at issue were the "assault" and "excessive force" claims against defendant Tyler.

On September 2, 2014, defendant Tyler filed the Motion For Summary Judgment (docket no. 35) now before me, seeking summary judgment in his favor on Daniels's claims on the basis of qualified immunity. Daniels filed her Resistance (docket no. 41) on September 26, 2014, and Tyler filed a Reply (docket no. 45), in further support of his Motion, on October 6, 2014. Defendant Tyler requested oral arguments on his Motion For Summary Judgment, but my crowded schedule has not permitted the timely scheduling of oral arguments, and I find the parties' written submissions to be adequate to resolve the issues presented. Therefore, Tyler's Motion For Summary Judgment is

---

³ In her Complaint, Daniels also asserted, in Count IV, a claim of "intentional infliction of emotional distress" on her minor daughter, Y.A., and, in Count V, a claim of "negligent infliction of emotional distress" on Y.A., based on additional factual allegations that, on or about February 23, 2012, during class time, a City employee and a Sioux City School District employee showed Y.A. and the rest of her class at West Middle School in Sioux City, Iowa, a video of her mother being "brutalized" by Tyler. Daniels named the City and the Sioux City Community School District as the defendants, and their liability was premised on wrongful acts of their employees committed while acting within the scope of their employment. In a Memorandum Opinion And Order Regarding The Defendant School District's Motion To Dismiss (docket no. 23), filed November 8, 2013, I dismissed the claims against the School District, without prejudice, for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

deemed fully submitted on the written submissions. Trial in this matter is scheduled to begin on January 20, 2015.

## II. LEGAL ANALYSIS
### A. *Standards For Summary Judgment*

Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thus, "[t]he movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Celotex*, 477 U.S. at 323). In response, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

When the parties have met their burden, the district judge's task is as follows:

> "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Ricci v. DeStefano*, ---U.S. ----, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009) quoting *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (internal

> quotations omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). . . . . "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Ricci*, 129 S. Ct. at 2677, quoting *Matsushita*, 475 U.S. at 587, 106 S. Ct. 1348.

*Torgerson*, 643 F.3d at 1042-43.

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ryan v. Capital Contractors, Inc.*, 679 F.3d 772, 776 (8th Cir. 2012). However, summary judgment is particularly appropriate when only questions of law are involved, rather than factual issues that may or may not be subject to genuine dispute. *See, e.g., Cremona v. R.S. Bacon Veneer Co.*, 433 F.3d 617, 620 (8th Cir. 2006).

I will apply these standards here.

### B. Standards For Qualified Immunity From "Excessive Force" Claims

As the Eighth Circuit Court of Appeals has succinctly explained, in an "excessive force" case,

> "Government officials who perform discretionary functions are entitled to qualified immunity unless their alleged conduct violated clearly established federal constitutional or statutory rights of which a reasonable person in their positions would have known." *Ottman v. City of Independence, Mo.*, 341 F.3d 751, 756 (8th Cir.2003).

9

> Therefore, to determine whether an official is entitled to summary judgment on the basis of qualified immunity, we review (1) whether the facts alleged, construed in the light most favorable to the plaintiff, establish a violation of a constitutional or statutory right, and (2) whether the right was clearly established when the alleged violation occurred, such that a reasonable official would have known his actions were unlawful. *Fourte v. Faulkner Cnty., Ark.*, 746 F.3d 384, 387 (8th Cir.2014) (citing *Keil v. Triveline*, 661 F.3d 981, 985 (8th Cir.2011)). "If the answer to either question is no, then the agents are entitled to qualified immunity." *Keil*, 661 F.3d at 985.

*Williams v. Holley*, 764 F.3d 976, 979 (8th Cir. 2014) (footnote omitted); *accord Meehan v. Thompson*, 763 F.3d 936, 940 (8th Cir. 2014) (articulating essentially identical standards in a case involving, *inter alia*, an "excessive force" claim); *see also DeBoise v. Taser Int'l, Inc.*, 760 F.3d 892, 896 (8th Cir. 2014) (in deciding whether the law was "clearly established," the court looks to the state of the law at the time of the incident). The court may use its "sound discretion" to decide which of the two prongs of the "qualified immunity" analysis to consider first, in light of the circumstances of the case. *Meehan*, 763 F.3d at 940 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). The court must remember that "[q]ualified immunity provides 'ample room for mistaken judgment' and protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986)); *accord Stanton v. Sims*, ___ U.S. ___, 134 S. Ct. 3, 5 (2013) ("Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law.").

As the Eighth Circuit Court of Appeals has also explained,

> An excessive force claim in the context of an arrest is "evaluated under the reasonableness standard of the Fourth Amendment." *Coker v. Arkansas State Police*, 734 F.3d 838,

> 842 (8th Cir.2013) (quoting *Johnson v. Carroll*, 658 F.3d 819, 825 (8th Cir.2011)).
>
> The reasonableness of a particular use of force must be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vison of hindsight." *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir.2009) (quoting *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). "The reasonableness inquiry, however, is an objective one: the question is whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting them." *Id*. (citation and internal quotation marks omitted). "Circumstances relevant to the reasonableness of the officer's conduct include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. (citations and internal quotation omitted).

*Williams*, 764 F.3d at 979-80. Also, "'[t]he degree of injury is certainly relevant insofar as it tends to show the amount and type of force used,'" but "'it is logically possible to prove an excessive use of force that caused only a minor *injury*.'" *Bishop v. Glazier*, 723 F.3d 957, 962 (8th Cir. 2013) (quoting *Chambers v. Pennycook*, 641 F.3d 898, 906 (8th Cir. 2011), with emphasis in the original). The court must also remember that "'[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'" *Smith v. City of Minneapolis*, 754 F.3d 541, 546 (8th Cir. 2014) (quoting *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)).

"If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). On the other hand, if there are disputes concerning

predicate facts material to the qualified immunity determination, summary judgment is not appropriate. *Greiner v. City of Champlin*, 27 F.3d 1346, 1352 (8th Cir. 1994) (citations omitted). Thus, "'[t]o defeat the motion for summary judgment, [Daniels] need[s] to present enough evidence to permit a reasonable jury to conclude that [Tyler's] use of . . . force was objectively unreasonable.'" *Smith v. City of Brooklyn Park*, 757 F.3d 765, 773 (8th Cir. 2014) (quoting *Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir. 2001)).

As to Daniels's state-law "assault" claim, an Iowa statute provides as follows:

> A peace officer, while making a lawful arrest, is justified in the use of any force which the peace officer reasonably believes to be necessary to effect the arrest or to defend any person from bodily harm while making the arrest.

IOWA CODE § 808.4(1). Three decades ago, the Iowa Supreme Court concluded that, in light of this statute, "an assault only occurs if the peace officer does not reasonably believe the particular force was necessary in the circumstances." *Johnson v. Civil Serv. Comm'n of City of Clinton*, 352 N.W.2d 252, 257 (Iowa 1984). Two decades ago, the Iowa Supreme Court recognized that this statute establishes an "objective reasonableness" standard for the use of force by arresting officers, finding support for that reading in the United States Supreme Court's "qualified immunity" standard for "excessive force" claims in *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). *See Chelf v. Civil Serv. Comm'n of City of Davenport*, 515 N.W.2d 353, 355-56 (Iowa 1994). More recently, the Iowa Court of Appeals has explained, "Section 808.4 does not state a cause of action but rather is a defense to what would otherwise be an assault or battery," and, thus, an "excessive force" claim is the "functional equivalent of a claim for assault and battery" under state law. *Blacketer v. State, Div. of Narcotics Enforcement*, 2007 WL 4191979, *2 (Iowa Ct. App. Nov. 29, 2007) (slip op.). Consequently, as Chief Magistrate Judge Walters of the Southern District of Iowa explained, in light of this statute, "'[p]olice

12

officers are privileged to commit a battery pursuant to a lawful arrest' subject to the limitation on excessive force." *Lawyer v. City of Council Bluffs*, 240 F. Supp. 2d 941, 955 (S.D. Iowa 2002) (citing 6 *Am.Jur.2d Assault and Battery* § 118 at 103, and *Restatement (Second) of Torts* § 132). In short, if Tyler enjoys "qualified immunity" to a claim of unconstitutional use of "excessive force," he also enjoys the immunity provided by IOWA CODE § 808.4 to a state-law claim of "assault."

### C. Application Of The Standards

I conclude that Daniels cannot defeat Tyler's Motion For Summary Judgment on her "excessive force" and "assault" claims, because she has not presented enough evidence to permit a reasonable jury to conclude that Tyler's use of force was objectively unreasonable. *See Smith*, 757 F.3d at 773; *Lawyer*, 240 F. Supp. 2d at 955. Assuming, for the sake of argument and contrary to my own view of the record, that there are genuine issues of material fact as to whether or not there was any violation of Daniels's constitutional right to be free from excessive force, I cannot find that a reasonable officer would have known that Tyler's actions were unlawful. *See Williams*, 764 F.3d at 979 (identifying the two prongs of the "qualified immunity" analysis); *Meehan*, 763 F.3d at 940 (the court may use its sound discretion whether of the two prongs to consider first, in the circumstances of the case). Remembering that "[q]ualified immunity provides 'ample room for mistaken judgment,'" *Meehan*, 763 F.3d at 940 (quoting *Malley*, 475 U.S. 343), and, moreover, that, in this case, Tyler was required to determine the amount of force necessary to subdue Daniels in circumstances that did, indeed, involve split-second judgment in tense, uncertain, and rapidly evolving circumstances, *see Smith*, 754 F.3d at 546 (citing *Graham*, 490 U.S. at 396-97), I simply cannot say that Tyler was either "'plainly incompetent'" or "'knowingly violate[d] the law.'" *Meehan*, 763 F.3d

at 940 (quoting *Malley*, 475 U.S. at 341); *accord Stanton*, ___ U.S. at ___, 134 S. Ct. at 5.

More specifically, judging Tyler's conduct "'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight,'" *Williams*, 764 F.3d at 980 (quoting *Brown*, 574 F.3d at 496), his actions were objectively reasonable in light of the facts and circumstances confronting him. *Id.* The crimes for which Tyler at first was arresting Daniels—failure to obey the direction to put down the cellphone, failure to put her hands behind her back when asked, and allowing a barred driver to operate her vehicle—were not particularly serious, but Daniels's physical resistance to arrest rapidly escalated into a more serious crime of assault on a peace officer. *See id.* (first relevant factor is the severity of the crime at issue). Also, when Daniels began to physically resist Tyler and Officer Nice, and particularly when she grabbed Tyler's shirt or belt near where his service weapon was located, Tyler had objectively reasonable concerns about whether Daniels posed an immediate threat to the safety of the officers or others. *Id.* (second factor is whether the suspect poses an immediate threat to safety of the officers or others). The situation was complicated by the presence of bystanders, even if the precise number and mood of the bystanders is uncertain or disputed, and by the fact that Robinson, who was known by Tyler to traffic in and sometimes to carry firearms, was at large and, in fact, appeared in the midst of his struggle to handcuff Daniels. There can be no doubt that Daniels was actively and strenuously physically resisting the efforts of Tyler and Officer Nice to arrest her, even if there are disputes about the extent to which she was belligerent, yelling, spewing profanity, or otherwise uncooperative. *Id.* (third factor is whether the suspect was actively resisting arrest or attempting to evade arrest by flight). Tyler's (and Officer Nice's) concerns about safety under the circumstances are not unreasonable, Daniels's protestations to the contrary notwithstanding objective scrutiny. Also, Daniels has pointed to nothing in the record to

14

suggest that the force used to subdue her was objectively unreasonable, based on the nature or extent of her physical injuries, *see Bishop*, 723 F.3d at 962, where, despite her complaints at the scene, paramedics called to the scene did not see any obvious injuries to Daniels's eye or back or any injuries from her insulin pump coming lose, so that they did not see any reason to transport her to the hospital.

The record establishes that "qualified immunity" and IOWA CODE § 808.4 bar Daniels's claims against Tyler for unconstitutional "excessive force" and common-law "assault," and Tyler is entitled to summary judgment on those claims. *See Saucier*, 533 U.S. at 202; *Torgerson*, 643 F.3d at 1042-43.

### III. CONCLUSION

Upon the foregoing,

1. Defendant Tyler's September 2, 2014, Motion For Summary Judgment (docket no. 35) is **granted** as to both of Daniels's remaining claims of "excessive force" and "assault"; and

2. Because no claims remain viable, the Clerk of Court is directed to enter judgment for defendant Tyler and against plaintiff Daniels, and this action is dismissed in its entirety.

**IT IS SO ORDERED**.

**DATED** this 23rd day of October, 2014.

_Mark W. Bennett_
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA